IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

TORSHAZO WILLIAMSON,

Plaintiff,

v.

CAPTAIN BROWN, *et al.*,

Defendants.

1:24CV431

## **MEMORANDUM OPINION, RECOMMENDATION, AND ORDER OF UNITED STATES MAGISTRATE JUDGE**

This case arises from Torshazo Williamson's pretrial detention at the Rockingham County Detention Center in March of 2024. Williamson, the plaintiff in this Section 1983 civil action, alleges that he was held in a cell next door to one with a broken toilet and when county law enforcement officers were moving him to that same cell, they tased him and assaulted him without justification. When he requested medical assistance related thereto, they failed to provide it within constitutionally-mandated bounds.

There are five pending motions before the Court:

1) Sheriff Sam Page, Cpt. Jennifer Brown, Sgt. Rodgers, Cpt. Mr. Brown, Sgt. Lee, Cpl. Kluk, Cpl. Ellis, Officer Dillon, Officer G. Brown,[1] Officer

Schorder, Officer Ms. Ortagea, and Officer J. Thompson's ("the moving defendants") motion for summary judgment, Docket Entry 52;
2) Joanna Peach's (identified as "Nurse Jo" in the complaint) motion for summary judgment, Docket Entry 54;
3) Peach's motion to seal, Docket Entry 57;
4) Williamson's motion for a subpoena, Docket Entry 60; and
5) The moving defendants' motion to strike Williamson's surreply, Docket Entry 71.

For the reasons set forth below, the Court should grant summary judgment as to all defendants save Sgt. Rodgers, Officer C.G. Brown, Officer Dillon, and Cpl. Kluk in their individual capacities, as genuine issues of material fact remain

[1] Williamson identifies this defendant as "Officer G. Brown"; as indicated in his affidavit in support of the moving

defendants' motion for summary judgment, he is Officer C.G. Brown.

regarding the excessive force claims against them.

The Court should grant Peach's motion for summary judgment.

Finally, the Court denies Peach's motion to seal and Williamson's motion for a subpoena. The Court grants the moving defendants' motion to strike Williamson's surreply.

### I. FACTS

The undisputed facts show the following[2]:

A. Sgt. Rodgers tases Williamson during a cell transfer.

On March 11, 2024, Williamson was a pretrial detainee at the Rockingham County Detention Center. *See generally* Docket Entry 61-1 (hereinafter "Williamson Aff."). That day, Sgt. Rodgers, Cpl. Kluk, Officer Dillon and Officer C.G. Brown came to Williamson's cell, H-117, to move him to cell H-118. *See* Williamson Aff. ¶ 2; Docket Entry 52-2 (hereinafter "Rodgers Aff.") ¶¶ 2, 8; Docket Entry 52-3 (hereinafter "Kluk Aff.") ¶ 2; Docket Entry 52-4 (hereinafter "C.G. Brown Aff.") ¶ 2.

Williamson did not want to move to cell H-118 because its toilet was broken, emanating the odor of feces and urine. *See* Williamson Aff. ¶ 3. Specifically, his "food trap in H-117 was allowed open to try to get some fresh air because of the smell from H-118 traveled threw [sic] the air vent into [his] cell." *See id.* ¶ 4. Williamson indicated to the officers that he did not want to move to the cell because of "the unsanitary toilet." *See id.* ¶ 7; *see also* Rodgers Aff. ¶ 3 ("When I informed Williamson of the change, he stated that he would not move."); C.G. Brown Aff. ¶ 3 ("Sgt. Rodgers gave Williamson several verbal commands to pack his stuff up but Mr. Williamson continued to refuse."); Kluk Aff. ¶ 4 (noting Sgt. Rodgers's "several attempts to get Williamson to comply").

Sgt. Rodgers then approached Williamson. *See* Williamson Aff. ¶ 10; Rodgers Aff. ¶ 7. The two made physical contact. *See* Williamson Aff. ¶ 10 ("Sgt. Rodgers come [sic] to the back of the cell and was threatening me. He started to bump his head against me to get a reaction."); Rodgers Aff. ¶ 7 ("I stepped over to Mr. Williamson and placed my arm on his right arm to try to talk him into

---

[2] While Williamson's complaint was not verified, he submitted a sworn affidavit along with his opposition to the moving defendants' motion for summary judgment reiterating the facts set forth in his Complaint, *see* Docket Entry 61-1, which the Court considers. *See Goodman v. Diggs*, 986 F.3d 493, 498 (4th Cir.

2021) ("'As a general rule, when one party files a motion for summary judgment, the non-movant cannot merely rely on matters pleaded in the complaint, but must, by factual affidavit or the like, respond to the motion.'") (quoting and citing *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991)).

2

complying but he told me step [sic] away from him.").

The parties disagree about what occurred next. Williamson states that Sgt. Rodgers drew his taser and so he (Williamson) began packing up his things and put his hands up to submit. *See* Williamson Aff. ¶¶ 11-12. The officers contend that Williamson continued to refuse orders. *See* Rodgers Aff. ¶ 8; C.G. Brown Aff. ¶ 3.

The parties agree that Sgt. Rodgers then deployed his taser, striking Williamson. *See* Williamson Aff. ¶ 13 ("Sgt. Rodgers then shot the taser at me in my side."); Rodgers Aff. ¶ 8 ("I asked Mr. Williamson again to comply, but he refused. I then moved Officer Dillon out of the way and deployed the taser on inmate Williamson[.]").

The parties agree that Williamson removed the taser probes once struck. *See* Williamson Aff. ¶ 13; Rodgers Aff. ¶ 8; Kluk Aff. ¶ 4. Officer C.G. Brown and Williamson made physical contact; the parties dispute exactly how. *See* Williamson Aff. ¶ 14 ("Ofc. G. Brown grabbed me and I was slammed on the floor. Ofc. Cl. Dillon began to punch me with closed fist [sic]"); Rodgers Aff. ¶ 8 ("Officers Dillon and Brown grabbed him"); C.G. Brown Aff. ¶ 4 ("Williamson began to fight myself and Officer Dillon"). Officer Dillon struck Williamson multiple times in the arm and one time to the side of the head. *See* Rodgers Aff. ¶ 9; Kluk Aff. ¶ 4.

Sgt. Rodgers then deployed the taser again, this time striking Williamson in the neck and face area. *See* Williamson Aff. ¶ 14 ("Sgt. Rodgers hit me in the face with the taser, similar to a pistol-whipping"); *id.* ¶ 15 ("Sgt. Rodgers held the taser to my mouth and dry tased me (he used the taser without the wires so it was more like a stun gun). He also tased me on the side of my face and head."); Rodgers Aff. ¶ 9 ("I went to apply the taser to his left arm, but he dropped his head as he approached me, causing the taser to catch him in the left side of the neck area.").

Officers subdued Williamson, including Cpl. Kluk, who took hold of Williamson's feet. *See* Kluk Aff. ¶ 5 ("At this time, I went to grab Mr. Williamson's feet to assist him to the ground"); Williamson Aff. ¶ 16 ("Cpl. Kluk grabbed my right leg and held it up."). Williamson maintains: "I never fought back or resisted in any way. I never showed any aggression. I never tried to take the taser from the officers." *See* Williamson Aff. ¶ 17.

Sgt. Rodgers directed Officers Dillon and C.G. Brown to take him to see the nurse. Rodgers Aff. ¶¶ 10-11 ("I instructed Officers Dillon and Brown to escort Mr. Williamson to see the nurse."); Kluk Aff. ¶ 5 ("Mr. Williamson was cuffed in the front and escorted to medical to be seen."); C.G. Brown Aff. ¶ 4 ("Williamson was secured and taken to the ground without injury to him. However, he was taken to the nurse as a precaution.").

3

B. Williamson seeks and receives medical care in the jail following the taser incident.

The facility contracted with Southern Health Partners, Inc. (SHP) to provide nursing care to inmates. *See* Docket Entry 55-1 (hereinafter "Peach Aff.") ¶ 3. The medical professional on duty when officers brought Williamson in for care was Joanna Peach, a licensed practical nurse. *See id*. ¶ 2.

In addition to Peach, SHP also contracted a medical doctor, Linwood Robinson, as medical director for the detention center. *See* Peach Aff. ¶ 5. Robinson was available for phone consultation and on call to make verbal orders for patients. *See id*. He generally came to the detention center once a week, as well. *See id*.

While Peach could see inmates for sick call visits, she could not do so unless a detention officer accompanied them, and when she did, she could not independently make medical decisions for inmates. *See id*. ¶¶ 7-8. That is, Robinson had to approve all medical decisions for inmates, including prescriptions and treatment orders. *See id*. ¶ 8.

Peach treated Williamson after he was tased. *See id*. ¶ 14. She noted that his vital signs were stable and that taser darts were located in his shirt, on his right abdomen and his mid-abdomen. *See id*. Peach did not recall seeing any injuries to Williamson's face; had she noted that, she would have recorded it in his medical records. *See id*. ¶ 16.

Williamson lodged a March 12 sick call request, wherein he reported that the left side of his face felt numb and he was having migraines and pain in his neck, left shoulder, and lower back. *See* Peach Aff. ¶ 17. In his March 13 sick call request, Williamson reported the same symptoms, adding that the left side of his face and his top lip were blistered and bleeding from a taser burn. *See id*. ¶ 19.

Peach responded to the March 13 request, advising Williamson that medical personnel had seen the March 12 request and confirming that he was on the list to be seen. *See id*. ¶ 20. In Williamson's March 14 sick call request, he reported that he was suffering from migraines, the left side of his face was more numb, and he was experiencing neck and lower back pain. *See id*. ¶ 21. In his March 15 request, Williamson asked why he had not yet been seen, and repeated the symptoms reported in his earlier requests. *See id*. ¶ 22.

Peach responded to the March 15 request, advising Williamson that she had received the earlier requests and had intended to see him on March 14 but there were no officers available to bring inmates for sick visits on that day or the day prior. *See id*. ¶ 23. She further told Williamson that he would soon receive ibuprofen in his medication package until he could be seen. *Id*. Williamson began receiving the medication that evening. *Id*.

That same day, Williamson submitted another sick call request, asking why he had not yet been seen. *Id*. ¶ 26.

4

Another nurse responded, advising him that Dr. Robinson would see him on the following Monday. *Id*. On March 18, Peach saw Williamson for a sick call visit. *Id*. ¶ 27. Williamson told her he was tased with a dry stun on the left side of his face; Peach inspected his left ear and it was "totally clear." *See id*. ¶ 27. Peach further noted that Williamson had no taser marks anywhere on his body, consistent with the barbs having attached to his clothing and not his person on March 11. *See id*. Williamson's vital signs were stable at this visit. *See id*.

Peach prescribed a twice daily dose of 220 mg of naproxen for Williamson, which he began receiving on March 19. *See id*. ¶ 30.

Williamson submitted another sick call request on March 22, noting that he told staff that he was dizzy when he got out of the shower and had a sharp pain in his head even after sitting down. *See id*. ¶ 31. Another nurse responded, confirming that he was on the list to see Dr. Robinson. *See id*. ¶ 32. On March 26, Williamson submitted a sick call request, noting that he was experiencing migraines, as well as pain in his neck, lower back, and ankle, and numbness in his left jaw and ankle. *See id*. ¶ 33.

Dr. Robinson saw Williamson on March 28. *See id*. ¶ 36. During the examination, he reported numbness and a superficial wound to the left side of his face; he admitted that he had repeatedly removed a scab there. *See id*. ¶ 36. Dr. Robinson entered an order for Excedrin headache relief

twice-daily and antibiotic ointment, both for seven days. *See id*. Dr. Robinson also entered an order for Williamson to receive an x-ray of his left ankle and left foot. *See id*. ¶ 38.

On March 29, Williamson submitted a sick call request, stating that the Excedrin was not helping as much as he had reported to Peach during that evening's medication pass. *See id*. ¶ 39. Peach responded to the request, letting Williamson know that she would notify Dr. Robinson. *See id*. ¶ 40. Two days later, Dr. Robinson discontinued the Excedrin and prescribed naproxen twice daily for five days. *See id*. ¶ 41.

On April 2, Williamson submitted another sick call request, reporting he was still having issues with migraines, and experiencing numbness on the left side of his face. *See id*. ¶ 42. Peach responded to the request and told him that he would see Dr. Robinson, a message she had already relayed in person. *See id*. ¶ 43.

Dr. Robinson saw Williamson again on April 4; he noted that the x-ray of Williamson's left ankle and foot was negative for any issues. *See id*. ¶ 44. Williamson complained of numbness on the left side of his face but it had not grown worse. *Id*. Dr. Robinson prescribed prednisone for the numbness, which was dispensed on April 9. *See id*. ¶ 45.

On April 11, Williamson submitted another sick call request, reporting that he was still having migraines and the medications were having no effect.

5

*See id.* ¶ 46. Peach advised him that she would speak with Dr. Robinson. *See id.* ¶ 47. On April 16, a prescription order was entered for Williamson to receive prednisone once daily for six days; Williamson began receiving his prescribed naproxen on April 17. *See id.* ¶ 49.

Williamson finished his regimen on prednisone on April 22 and did not submit any further sick call requests notifying the jail medical staff that his headache pain continued or that he needed further pain medication. *See id.* ¶ 50.

## II. PROCEDURAL HISTORY

Williamson filed this Section 1983 suit, alleging that the prison officers used excessive force in tasing him, in violation of his Eighth Amendment rights,[3] and the prison medical staff was deliberately indifferent to both his medical needs and conditions of confinement, in violation of his Fourteenth Amendment rights. *See* Compl. The defendants answered, *see* Docket Entries 31, 33, and the magistrate judge set a discovery schedule, *see* Docket Entry dated 06/30/2025. The moving defendants moved for summary judgment, *see* Docket Entry 52, and Peach separately did the same, *see* Docket Entry 54. Peach also moved to seal Williamson's medical records and portions of her affidavit incorporating the same. *See* Docket Entry 57.

Williamson moved for the issuance of a subpoena directing Central Prison in Raleigh to produce his medical records between the dates of November 19, 2025 and January 19, 2026. *See* Docket Entry 60. He responded in opposition to the two motions for summary judgment. *See* Docket Entry 61. In Williamson's opposition, he voluntarily dismissed all claims against Lee, Schorder, Ortega and Thompson, as well as all claims against all defendants in their official capacities, save Page. *See* Docket Entry 61. Williamson further agreed that his claims for injunctive relief were moot upon his transfer to the custody of the North Carolina Department of Adult Corrections, and dismissed those, as well. *See id.*

The defendants replied, *see* Docket Entries 67, 68, Williamson then filed a surreply, *see* Docket Entry 70, and the moving defendants moved to strike it, *see* Docket Entry 71. These matters are ripe for disposition.

## III. STANDARD OF REVIEW

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v.*

---

[3] Because Williamson was not a prisoner, but rather a pretrial detainee, this right derives from the Fourteenth Amendment.

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In analyzing a summary judgment motion, courts "must construe all facts and reasonable inferences in the light most favorable to the nonmoving party." *Bandy v. City of Salem*, 59 F.4th 705, 709 (4th Cir. 2023).

The moving party bears the burden of establishing the absence of a genuine dispute of material fact by "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Rule 56).

"Where, as here, the nonmoving party bears the ultimate burden of proof at trial, the moving party may discharge its initial burden at summary judgment by 'showing – that is, pointing out to the . . . court – that there is an absence of evidence to support the nonmoving party's case.'" *Anderson v. Diamondback Inv. Grp., LLC*, 117 F.4th 165, 174 (4th Cir. 2024) (quoting *Celotex Corp.*, 477 U.S. at 325). "If the moving party carries this initial burden, the burden then shifts to the nonmoving party, who must 'go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine

issue for trial.'" *Id.* (quoting *Celotex Corp.*, 477 U.S. at 324).

"An affidavit or declaration used to support [summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); *see also Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996) (citing *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991)).

A party cannot rely on statements in a brief to support a motion for summary judgment, because they are not evidence. *City of Greensboro v. Guilford Cnty. Bd. of Elections*, No. 15-CV-559, 2017 WL 11488724, at *1 n.4 (M.D.N.C. Jan. 26, 2017) (collecting cases); *see also Hill v. Carvana, LLC*, No. 22-CV-37, 2022 WL 1625020, at *3 (M.D.N.C. May 23, 2022).

## IV.   GOVERNING LAW

Title 42, United States Code, Section 1983 "is a federal statutory remedy available to those deprived of rights secured to them by the Constitution and, in a more sharply limited way, the statutory laws of the United States" by persons acting under color of state law. *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). A plaintiff bringing suit pursuant to § 1983 must show that a person acting under color of state law violated a constitutional or other

federal legal right. *West v. Atkins*, 487 U.S. 42, 48 (1988).

### A. Excessive Force

Here, as against the moving defendants, the constitutional right at issue is the right to be free from an officer's use of excessive force, derived from the Fourteenth Amendment. *See Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989) (the Fourteenth Amendment "protects a pretrial detainee from the use of excessive force that amounts to punishment").

To succeed on such a claim, a pretrial detainee must show only that the force "purposely or knowingly used against him was objectively unreasonable." *See Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015). Courts may consider the following in weighing the reasonableness or unreasonableness of the force exerted: "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *See id.*

The United States Supreme Court recognized in *Kingsley* that "[o]fficers facing disturbances 'are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving.'" *Id.* (quoting and citing *Graham*, 490 U.S. at 397). Therefore, it has directed courts to judge the reasonableness of the force applied "from the perspective and with the knowledge of the defendant officer. We have also explained that a court must take account of the legitimate interests in managing a jail, acknowledging as part of the objective reasonableness analysis that deference to policies and practices needed to maintain order and institutional security is appropriate." *See id.* at 399-400.

### B. Deliberate Indifference to Serious Medical Needs and/or Conditions of Confinement

Here, as against Peach, the constitutional right at issue sounds in the Eighth Amendment but derives from the due process clause of the Fourteenth Amendment because of Williamson's status as a pretrial detainee. *See Short v. Hartman*, 87 F.4th 593, 606 (4th Cir. 2023) ("[T]his Court extended *Estelle* from Eighth Amendment claims to Fifth and Fourteenth Amendment Due Process Clause claims, reasoning that 'due process is at least as co-extensive as the guarantees of the [E]ighth amendment.'") (quoting and citing *Loe v. Armistead*, 582 F.2d 1291, 1294 (4th Cir. 1978)).

In *Whisenant v. Yuam*, 739 F.2d 160, 164 (4th Cir. 1984), the Fourth Circuit adopted an objective test for Fourteenth Amendment claims of deliberate indifference to serious medical needs, derived from the Supreme Court's holding in *Bell v. Wolfish*, 441 U.S. 520 (1979), wherein

8

the Court held that "[i]n evaluating the constitutionality of conditions or restrictions of pretrial detention ... the proper inquiry is whether those conditions amount to punishment of the detainee." *See Bell*, 441 U.S. at 535. "The Court in *Bell* explained that whereas the Eighth Amendment only protects post-conviction detainees from 'cruel and unusual punishment,' the Fourteenth Amendment Due Process Clause protects pretrial detainees from being punished at all." *Short*, 87 F.4th at 606, citing *Bell*, 441 U.S. at 535-37.

Thus, "deliberate indifference to serious medical needs violates the Fourteenth Amendment even in the absence of subjective intent to punish because no legitimate nonpunitive goal is served by a denial or unreasonable delay in providing medical treatment where the need for such treatment is apparent." *See id.* (internal quotation and citation omitted).

Thus,

> To state a claim for deliberate indifference to a medical need, the specific type of deliberate indifference claim at issue in this case, a pretrial detainee must plead that

(1) they had a medical condition or injury that posed a substantial risk of serious harm;

(2) the defendant intentionally, knowingly, or recklessly acted or failed to act to appropriately address the risk that the condition posed;

(3) the defendant knew or should have known (a) that the detainee had that condition and (b) that the defendant's action or inaction posed an unjustifiably high risk of harm; and

(4) as a result, the detainee was harmed.

*Short v. Hartman*, 87 F.4th 593, 611 (4th Cir. 2023).[4]

A serious medical need is one that has been "diagnosed by a physician as mandating treatment" or is "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016).

As to the jail personnel, principles of deliberate indifference under the Fourteenth Amendment also cover inhumane conditions of confinement. *See Karn v. PTS of America, LLC*, 590

---

[4] In *Short*, the Fourth Circuit found that in Fourteenth Amendment deliberate indifference claims, "[t]he plaintiff no longer has to show that the defendant had actual knowledge of the detainee's serious medical condition and consciously disregarded the risk that

their action or failure to act would result in harm ... Now, it is sufficient that the plaintiff show ... that the defendant should have known of that condition and that risk, and acted accordingly." *See* 87 F.4th 593, 611.

9

F. Supp. 3d 780, 809 (D. Md. 2022) (citing cases). The Supreme Court recognized as much in *Bell v. Wolfish*:

> [I]f a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees. Courts must be mindful that these inquiries spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility.

*Bell v. Wolfish*, 441 U.S. 520, 539 (1979) (internal citation omitted).

In considering a conditions of confinement claim, courts employ the two-pronged deliberate indifference test, considering first, whether there was deprivation of a basic human need that was *objectively* sufficiently serious, *see Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995). In so doing, courts should determine whether there was "a serious or significant physical or emotional injury resulting

from the challenged conditions or ... a substantial risk of such serious harm resulting from ... exposure to the challenged conditions." *See Scinto v. Stansberry*, 841 F.3d 219, 229 n.3 (4th Cir. 2016) (internal quotations and citation omitted).

Next, courts look to whether "the defendant acted or failed to act in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Hammock v. Watts*, 146 F.4th 349, 360 (4th Cir. 2025). The injury suffered or risked must be more than *de minimis*. *See Heyer v. United States Bureau of Prisons*, 849 F.3d 202, 210 (4th Cir. 2017); *Robles v. Prince George's Cty. Maryland*, 302 F.3d 262, 269 (4th Cir. 2002).

Courts have found that "grossly overcrowded and unsanitary" facilities can satisfy the objective prong, *see Brown v. Mitchell*, 308 F. Supp. 2d 682, 693 (E.D. Va. 2004) (citing *Wilson v. Seiter*, 501 U.S. 294 (1991); *Strickler v. Waters*, 989 F.2d 1375 (4th Cir. 1993)), as can leaving a pretrial detainee confined with human waste, *see Clark v. Daddysman*, No. 16-cv-0621, 2018 WL 1453333, at *10 (D. Md. Mar. 22, 2018) (citing *Williams v. Griffin*, 952 F.2d 820, 825 (4th Cir. 1991)); *Burkey v. Baltimore Cnty.*, No. GJH-20-2006, 2021 WL 3857814, at *7 (D. Md. Aug. 30, 2021); *Webb v. Deboo*, 423 F. App'x 299, 301 (4th Cir. 2011); *Fletcher v. Dykes*, No. 17-cv-0914-TDC, 2018 WL 3785143, at *7 (D. Md. Aug. 9, 2018); *see also Walker v.*

10

*Schult*, 717 F.3d 119, 127 (2d Cir. 2013).

## V.    DISCUSSION

A. The Court should grant summary judgment to Page in his official capacity on the basis of sovereign immunity.

At the time of the incident, Page was an employee of Rockingham County. And official capacity lawsuits "'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (quoting *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 690 n.55 (1978)).

And "[f]or purposes of Section 1983, a municipality is considered a 'person' and thus is subject to suit." *Hunter v. Town of Mocksville*, 897 F.3d 538, 553 (4th Cir. 2018) (citing *Monell*, 436 U.S. at 690). However, a city cannot be *vicariously* liable for the acts of its employees. *Id.* at 553-54. "Rather, 'it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.'" *Id.* at 554 (quoting *Monell*, 436 U.S. at 694).

In other words, "municipal liability under Section 1983 attaches only to 'action [taken] pursuant to official municipal policy of some nature.'" *Id.* (quoting *Pembaur v. City of*

*Cincinnati*, 475 U.S. 469, 477 (1986)). A single decision may create an official policy "so long as that governmental unit possessed 'final authority to create official policy.'" *Id.* (quoting *Semple v. City of Moundsville*, 195 F.3d 708, 712 (4th Cir. 1999)).

"'The question of who possesses final policymaking authority is one of state law.'" *Id.* at 555 (quoting *Riddick v. Sch. Bd.*, 238 F.3d 518, 523 (4th Cir. 2000)). Courts "'must look to the relevant legal materials, including state and local positive law, as well as custom or usage having the force of law.'" *Id.* (quoting *Riddick*, 238 F.3d at 523). A "municipality may delegate its final policymaking authority to other officials or governing bodies." *Id.*

Here, there are no genuine issues of material fact wherein a reasonable jury could find that Page, as an agent of the municipality, was acting according to an official municipal policy of some nature. Accordingly, the Court should dismiss the claim against him in his official capacity.

B. The Court should grant summary judgment to Cpt. Mr. Brown and Cpl. Ellis in their individual capacities.

Government officials may be liable under § 1983 "only for their personal wrongdoing or supervisory actions that violated constitutional norms." *Timpson ex rel. Timpson v. Anderson Cnty. Disabilities & Special Needs*

*Bd.*, 31 F.4th 238, 257 (4th Cir. 2022); *see also Iqbal*, 556 U.S. at 676 ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior."). In other words, liability under § 1983 is "personal, based upon each defendant's own constitutional violations." *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001).

However, a plaintiff can prevail on a claim against a supervisor with facts wherein a reasonable jury could find:

(1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff;
(2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and
(3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (internal quotations and citations omitted). As to the "pervasive and unreasonable risk" element, there must be facts wherein a reasonable jury could find that it was "widespread, or at least has been

used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury." *See id.*

Here, defendant Captain Brown (versus Officer C.G. Brown) was Sgt. Rodgers's supervisor and was not present at the time that Sgt. Rodgers tased Williamson. And the record is devoid of facts a reasonable jury could rely upon to find that, assuming *arguendo* Williamson was acting in a manner that posed "a pervasive and unreasonable risk of constitutional injury" to Williamson, Captain Brown had actual or constructive knowledge of it, let alone a causal link between his inaction and the conduct. The Section 1983 claim against Captain Brown in his individual capacity should therefore be dismissed.

The undisputed facts also show that named defendants Cpt. Jennifer Brown and Cpl. Ellis were not involved in any manner in any alleged use of excessive force (the tasing incident), the conditions of confinement (the odiferous toilet) or deliberate indifference to medical needs (the follow-up care). Accordingly, the Court should dismiss the claims against them in their individual capacities.

C. The Court should deny Officers C.G. Brown and Dillon, Cpl.

12

Kluk, and Sgt. Rodgers's motion for summary judgment.

As the moving party seeking summary judgment, these defendants bear the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 325.

There is no dispute that Rodgers tased Williamson twice, that Officer Dillon struck Williamson multiple times in the arm and once to the side of the head, and that Officers C.G. Brown and Dillon subdued him immediately thereafter. There is no dispute that Cpl. Kluk was present in the cell at the time of the tasing and assisted officers in subduing Williamson after the fact.

To meet their burden as the moving parties that the manner in which the defendants tased and/or subdued Williamson did not amount to excessive force, these defendants represent, as to the facts, that prior to the first taser strike, "Plaintiff actively resisted" Sgt. Rodgers when he put hands on him to gain compliance. *See* Docket Entry 53, at 11. But significantly, they cite to *no* record evidence to support that assertion. By contrast, Williamson affirmatively represents that he was defenseless, hands in the air, when Rodgers deployed his taser: "Sgt. Rodgers … drew his taser … I stopped packing my things, faced Sgt. Rodgers, and put my hands strait [sic] up to submit," *see* Williamson Aff. ¶¶ 11-12, and "I never fought back or resisted in any way. I never showed any aggression. I never tried to take the taser from the officers." *Id.* ¶ 17.

And "if testimony of a nonmovant is based on personal knowledge or firsthand experience, it can be evidence of disputed material facts, even if it is uncorroborated and self-serving." *See Nalls v. Baltimore Cnty., Maryland*, No. CV ELH-23-0183, 2026 WL 885716, at \*22 (D. Md. Mar. 30, 2026) (citing *Lovett v. Cracker Barrel Old Country Store, Inc.*, 700 F. App'x 209, 212 (4th Cir. 2017) (unpublished)). In fact, "a great deal of perfectly admissible testimony fits the description" of self-serving. *Cowgill v. First Data Technologies, Inc.*, 41 F.4th 370, 383 (4th Cir. 2022) (citation modified).

Sgt. Rodgers does represent in his affidavit that prior to deploying his taser, "I stepped over [sic] Mr. Williamson and placed my arm on his right arm to try to talk him into complying but he told me [sic] step away from him. I asked Mr. Williamson again to comply, but he refused." *See* Rodgers Aff. ¶¶ 7-8. But "[w]hen there is contrary evidence, a court may not simply accept what may be a self-serving account by the police officer." *Jackson v. Carin*, 128 F.4th 525, 535 (4th Cir. 2025) (quoting *Ingle ex rel. Est. of Ingle v. Yelton*, 439 F.3d 191, 195 (4th Cir. 2006)) (internal quotation marks omitted).

The Supreme Court in *Kingsley* directed courts to consider, in weighing excessive force claims under the Fourteenth Amendment, "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer

13

to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015).

As a threshold matter, it is well-settled in this Circuit that "[d]eploying a taser is a serious use of force. The weapon is designed to caus[e] ... excruciating pain[.]" *See Est. of Armstrong ex rel. Armstrong v. Vill. of Pinehurst*, 810 F.3d 892, 902 (4th Cir. 2016) (internal quotation and citation omitted) (alteration in original). And the Fourth Circuit has determined that "tasers are proportional force only when deployed in response to a situation in which a reasonable officer would perceive some immediate danger that could be mitigated by using the taser." *See id*. at 902.

Here, regarding the first taser strike, there is a dispute as to whether Williamson was physically resisting the officers' directive, implicating the first *Kingsley* factor of the necessity of the force. Williamson maintains that not only was he not physically resisting, he was actively compliant – packing up his belongings to move and raising his hands in surrender. Thus, there would have been no need to exert the level of force that Sgt. Rodgers did and its use was not proportional. *See Casey v. City of Fed. Heights*, 509 F.3d 1278, 1286 (10th Cir. 2007) ("[I]t is excessive to use a Taser to control a target without

having any reason to believe that a lesser amount of force—or a verbal command—could not exact compliance."). This weighs against granting summary judgment.

In terms of the extent of Williamson's injuries, it is undisputed that the first strike made contact with his abdomen. *See* Peach Aff. ¶ 14; Williamson Aff. ¶ 13. It is also undisputed that he had the wherewithal to remove the taser probes immediately thereafter. *See* Rodgers Aff. ¶ 8; Williamson Aff. ¶ 13; Kluk Aff. ¶ 4. And, while the record is replete with Williamson's sick call requests related to the second taser strike, there is very little record evidence regarding the effects of the first, which weighs in favor of granting the motion. As to the security threat, it is undisputed that there were three other officers present in the cell to assist Sgt. Rodgers in gaining Williamson's compliance even if he was physically resisting. This weighs against granting the motion.

As to the second taser strike, there again is a dispute as to what happened immediately beforehand: whether Williamson was the aggressor in the physical contact with Officers Dillon and C.G. Brown or whether they acted unprovoked. Williamson states: "Ofc. G. Brown grabbed me and I was slammed on the floor. Ofc. Cl. Dillon began to punch me with closed fist [sic]." *See* Williamson Aff. ¶ 14. Sgt. Rodgers maintains: "Officers Dillon and Brown grabbed [Williamson]." *See* Rodgers Aff. ¶ 8. And Officer C.G.

14

Brown states: "Williamson began to fight myself and Officer Dillon." *See* C.G. Brown Aff. ¶ 4.

It is undisputed, though, that Sgt. Rodgers tased Williamson in the neck area. *See* Williamson Aff. ¶ 15; Rodgers Aff. ¶ 9 ("I went to apply the taser to his left arm, but he dropped his head as he approached me, causing the taser to catch him in the left side of the neck area.").[5]

And the record contains far more information about the extent of the injury Williamson suffered from the second strike: he submitted ten sick call requests between March 11 (the date of the taser strike) and April 11, recounting symptoms related thereto. *See* Peach Aff. ¶¶ 17, 19, 21-22, 27, 31, 33, 40, 42, 46. He also had two visits with Dr. Robinson during that same stretch wherein he recounted pain and numbness in the left side of his face related to the second taser strike and pain in his ankle (presumably related to the way that Officers C.G. Brown and Dillon and Cpl. Kluk brought him to the ground). *See* Peach Aff. ¶¶ 36, 44. Thus, while the care that Peach provided was responsive to his pain and constitutionally sound (as set forth *infra*), the sustained nature of Williamson's complaints about the effects of this strike weighs against granting summary judgment. *Compare with Jones v. Henderson Cnty. Det. Ctr.*, No. 1:15-CV-132-

---

[5] In her affidavit, Peach states that she saw Williamson on March 11 and did not recall seeing any evidence that he sustained injuries to his face. *See* Peach

FDW, 2017 WL 581324, at *5 (W.D.N.C. Feb. 13, 2017) (*Kingsley* injury prong not satisfied where the plaintiff "suffered only minimal injuries from the use of the TASER, including a hole where the barb of the TASER pricked him and the pain ... from getting electrocuted. Plaintiff did not require any medication from these injuries.") (internal quotation and citation omitted).

Finally, as to the security threat posed, the same issues of material fact bubble up there as to the necessity of the force exerted: it depends on whether Officers C.G. Brown and Dillon and Cpl. Kluk laid hands on a passive or resistant detainee. This is a credibility issue that cannot be resolved at this stage in the proceedings, and weighs against granting the motion for summary judgment as to Sgt. Rodgers and Officers C.G. Brown and Dillon.

In sum, construing the facts in the light most favorable to Williamson, a reasonable jury could return a verdict in his favor on his § 1983 claim against these three defendants. The Court should deny Sgt. Rodgers, Officer Dillon, and Officer C.G. Brown's motion for summary judgment.

There remains the issue of Cpl. Kluk's liability in his individual capacity. It is undisputed that he was present for both tasing incidents, and that he

---

Aff. ¶ 16. However, both Williamson and Sgt. Rodgers agree that the taser struck the left side of his neck area at the very least.

participated in bringing Williamson to the ground by holding onto his foot. Williamson's sick call requests often made reference to pain in his ankle, such that it was x-rayed. *See* Peach Aff. ¶¶ 33, 38, 44.

Thus, while Williamson does not articulate the legal theory supporting his claim against Cpl. Kluk, it could be based upon participation in an unlawful assault and/or bystander liability. Williamson has alleged very few facts as to the first theory of liability, but the Court need not make a determination as to its viability because genuine issues of material fact remain under the bystander theory.

To that end, the Fourth Circuit has recognized, as an outgrowth of supervisory liability in Section 1983 cases, that "in certain circumstances, liability may attach to one who did not personally inflict the excessive force." *See Wetherington v. Keil*, 2025 WL 3035172, at *11 (E.D. Va. Oct. 30, 2025) (citing *Johnson v. Robinette*, 105 F.4th 99, 123–24 (4th Cir. 2024)). "'[A]n officer may be liable under § 1983, on a theory of bystander liability, if he: (1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act.' The 'bystanding officer must know of his fellow officer's misconduct …. If the bystander lacks such specific knowledge, he cannot be a participant in the unlawful acts, and the imposition of personal liability is impermissible.'" *Johnson v.*

*Robinette*, 105 F.4th 99, 124 (4th Cir. 2024) (quoting and citing *Randall v. Prince George's Cnty.*, 302 F.3d 188, 204 and n.24).

There remain factual disputes as to whether Williamson physically resisted officers attempting to move him from one cell to the other. If a jury accepted Williamson's version of events, Sgt. Rodgers tased Williamson unprovoked, and then tased him a second time after two other officers (Officers C.G. Brown and Dillon) assaulted him. Again, accepting Williamson's account, Cpl. Kluk then still laid hands on him to bring him to the ground.

A reasonable jury could thus find that Sgt. Rodgers violated Williamson's constitutional right under the Fourteenth Amendment to be free of excessive force as a pretrial detainee and that Cpl. Kluk had a reasonable opportunity to prevent that harm, specifically Sgt. Rodgers's second deployment of the taser. And not only would that set of facts show that Cpl. Kluk failed to act to intercede, but that he participated in assaulting a passive detainee.

Accordingly, because those issues of material fact remain as to Cpl. Kluk, the Court should deny his motion for summary judgment as to him in his individual capacity.

D. The Court should grant Peach's motion for summary judgment.

Finally, Williamson alleges that Peach violated his constitutional rights by showing deliberate indifference to his medical needs arising from the tasing

16

incidents and ensuing scuffle that took place on March 11. Because there are no genuine issues of material fact as to this claim, the Court should grant summary judgment in Peach's favor, as she is entitled to relief as a matter of law.

As referenced above, for Williamson to prevail on a deliberate indifference claim under the Fourteenth Amendment, a jury would need to find that he had an injury that posed a substantial risk of harm, Peach acted intentionally, knowingly, or recklessly in failing to act appropriately to address it, she knew or should have known that her inaction posed an "unjustifiably high risk of harm," and that Williamson was, in fact, harmed. *See generally Short v. Hartman*, 87 F.4th 593, 611 (4th Cir. 2023).

A serious medical need is one that has been "diagnosed by a physician as mandating treatment" or is "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016). Other courts have determined that "minor burns and associated scarring" from tasing do not constitute a serious medical need to support a deliberate indifference claim. *See Roebling v. City of Tuscaloosa, Alabama*, No. 7:14-CV-151-SGC, 2015 WL 7433147, at *5 (N.D. Ala. Oct. 30, 2015), *report and recommendation adopted*, No. 7:14-CV-151-RDP, 2015 WL 7424120 (N.D. Ala. Nov. 23, 2015) (citing *Hayward v. Kile*, No. CIV.A CV607-68, 2009 WL 2045925, at *8 (S.D. Ga. June 12,

2009) (finding, on summary judgment, that ulcer caused by taser burn was not an "objectively serious medical need"), *report and recommendation adopted*, 2009 WL 2045923 (S.D. Ga. July 13, 2009)).

The Court need not make a finding as to whether the tasing and its aftermath meet the *Kingsley* standard, though, because the undisputed facts show that Peach did not act intentionally, knowingly, or recklessly in failing to address Williamson's complaints. His medical records tell the opposite tale: every time he submitted a sick call request, it was answered, and both Peach and Dr. Robinson took multiple steps, including examinations and the prescription of painkillers, to address Williamson's stated ailments. *See, e.g.*, *Richards v. Glover*, No. 2:16-CV-707-ALB, 2019 WL 2608366, at *11 (M.D. Ala. May 29, 2019), *report and recommendation adopted*, No. 2:16-CV-707-ALB, 2019 WL 2606931 (M.D. Ala. June 25, 2019) (granting summary judgment to medical providers on deliberate indifference claim for care provided after prison attack where providers "evaluated [the plaintiff] after the ... attack, prescribed medication to him in accordance with their professional judgment, and ordered x-rays to assist in their assessment and treatment of his injuries").

And Williamson's "self-serving assertion of deliberate indifference does not create a question of fact in the face of contradictory,

Case 1:24-cv-00431-WO-JGM    Document 75    Filed 08/07/26    Page 17 of 22

contemporaneously created medical records." *See id.* at *11 (citation omitted). This is because it is well-settled that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Accordingly, because no reasonable jury could conclude that Peach acted intentionally, knowingly, or recklessly in failing to act appropriately to address the aftermath of the tasing incidents, the Court should grant summary judgment to Peach.

> E. Any deliberate indifference conditions of confinement claim fails as a matter of law.

Finally, a word about the toilet: Williamson maintains in his sworn affidavit, filed in opposition to the defendants' respective motions for summary judgment, that the toilet in the next-door cell, H-118, had been broken for approximately eight months prior to March 11. *See* Docket Entry 61-1, ¶ 3.

But Williamson sets forth no facts indicating that the smell emanating from the toilet into his cell risked "a serious or significant physical or emotional injury … or … a substantial risk of such serious harm resulting from … exposure[,]" *see Scinto v. Stansberry*, 841 F.3d 219, 229 n.3 (4th Cir. 2016), that would satisfy the requisite objective test. Accordingly, to the extent that he would advance a conditions of confinement claim against any of the defendants, in their individual or official capacities, the defendants would be entitled to judgment on those claims as a matter of law.

> F. Peach has not made a sufficient showing to support her motion to seal.

Contemporaneous to filing her motion for summary judgment, Peach filed a motion to seal the medical records associated therewith. *See* Docket Entry 57. In support thereof, Peach notes the Court's authority to seal materials pursuant to Local Rule 5.4, and her desire to present them as exhibits to her motion without violating federal and state confidentiality statutes.

The public has a long-established right of access to judicial records. *Nixon v. Warner, Commc'ns, Inc.*, 435 U.S. 589, 597 (1978); *Va. Dep't of State Police v. Wash. Post*, 386 F.3d 567, 575 (4th Cir. 2004). The right derives from two sources, the common law and the First Amendment. *United States ex rel. Oberg v. Nelnet, Inc.*, 105 F.4th 161, 170–71 (4th Cir. 2024). However, the right of access is not absolute and can be rebutted. *Rushford v. New Yorker, Mag.,* Inc., 846 F.2d 249, 253 (4th Cir. 1988). The burden of establishing a right to limit public access is on the party claiming the need for confidentiality. *Id.*

18

The common law right of access applies to all judicial records but can be rebutted if "countervailing interests heavily outweigh the public interests in access." *Id*. The First Amendment right of access is narrower and applies only to particular judicial records and documents. *Doe v. Public Citizen,* 749 F.3d 246, 266 (4th Cir. 2014). To overcome the right of access based on the First Amendment, a party must show "a compelling governmental interest" and that the restriction is "narrowly tailored." *Id*.

When documents are filed in connection with a dispositive motion, the "more rigorous First Amendment standard … appl[ies]." *Va. Dep't of State Police v. Wash. Post*, 386 F.3d 567, 576 (4th Cir. 2004) (explaining that once documents produced in discovery are "made part of a dispositive motion, they [have] lost their status as being raw fruits of discovery.") (internal quotation and citation omitted). Thus, Peach "must present specific reasons in support of [her] position." *See id*. at 575.

This she does not do. *See Musgrove v. Moore*, No. 1:19-CV-164, 2022 WL 19977408, at *2 (M.D.N.C. Apr. 20, 2022) ("The defendants' conclusory references to an assortment of statutes and regulations does not establish these records are confidential or show a compelling interest to justify sealing.") (citing *Va. Dep't of State Police*, 386 F.3d at 575). And "[f]ederal courts have recognized … that where a party voluntarily puts

his or her medical information or status into issue, it is more difficult to find that the party's privacy interests constitute a compelling interest that outweighs the First Amendment right of access to documents, even if the documents are medical records." *See Johnson v. City of Fayetteville*, No. 12–cv–456, 2014 WL 7151147, at *11–12 (E.D.N.C. Dec. 11, 2014). As the court noted in *Musgrove* in denying such a motion to seal in a deliberate indifference case:

> While the Court recognizes that medical records are ordinarily kept confidential, that is not always the case when those records are important to a lawsuit the patient himself has brought. Mr. Musgrove has neither joined in the motion to seal nor expressed any concerns about the confidentiality of the materials, indicating he has no confidentiality concerns about the limited records at issue.

2022 WL 19977408, at *2.

Like Musgrove, Williamson has placed his medical condition squarely at issue in his claim against Peach. He has not joined in her motion to seal, and she has not identified, with the specificity required, the justification therefor. Accordingly, the motion to seal is denied.

G. Williamson's motion for a subpoena is denied.

19

Williamson has also filed a motion requesting that this Court issue a subpoena pursuant to Federal Rule of Civil Procedure 34 for Central Prison in Raleigh to produce his psychological records generated between November 19, 2025 and January 19, 2026. *See* Docket Entry 60. In support thereof, Williamson states only the need "to substantiate findings of material fact." *See id*. The North Carolina Department of Adult Corrections, which manages Central Prison, is not a party to this suit and thus, service pursuant to Federal Rule of Civil Procedure 45 would apply. *See* Fed. R. Civ. P. 34(c).

Both the moving defendants and Peach oppose the motion. *See* Docket Entries 62, 63. In so doing, the moving defendants correctly note that this Court entered a scheduling order governing all discovery in the matter, including the date it would close, December 30, 2025. *See* Docket Entry dated 06/30/2025. Williamson filed the instant motion on February 17, 2026, well over a month past that date, and after the defendants moved for summary judgment. As such, they argue that Williamson's attempted service of such a subpoena is untimely. And there is case law to support that proposition. *See Mortgage Info. Servs., Inc. v. Kitchens*, 210 F.R.D. 562, 566

(W.D.N.C. 2002) ("[A] Rule 45 subpoena does in fact constitute discovery.") (citing cases).

While courts have recognized that parties may occasionally use Rule 45 to "itemize[e] specific documents necessary for use as exhibits at trial," *see id*., such is not the case here, where summary judgment motions were pending and Williamson indicated his need for the subpoena to shed light on material facts, presumably related to the motions for summary judgment that were filed shortly before his motion.[6] And "when a plaintiff … is aware of the existence of documents before the discovery cutoff date and issues discovery requests including subpoenas after the discovery deadline has passed, then the subpoenas and discovery requests should be denied." *See McNerney v. Archer Daniels Midland Co.*, 164 F.R.D. 584, 588 (W.D.N.Y. 1995); *see also Fleetwood Transp. Corp. v. Packaging Corp. of Am.*, No. 1:11MC45, 2011 WL 6151479, at *2 (M.D.N.C. Dec. 12, 2011) ("Upon the determination that a Rule 45 subpoena constitutes discovery, courts have routinely held that said subpoenas served outside of the discovery period are untimely.").

Here, Williamson seeks a subpoena for his own medical records starting

---

[6] Williamson, in his reply to the defendants' respective oppositions to his motion for the subpoena, headlines one of his arguments as "Trial Preparation Materials," but had, in the original motion, referenced "findings of material

fact," phraseology that smacks of the summary judgment standard. This cursory reference to trial is an insufficient basis for the Court to grant his motion.

in November 2025, prior to the December 30, 2025 conclusion of discovery. As such, he was "aware of the existence of documents before the discovery cutoff date," *see McNerney*, 164 F.R.D. at 588. Because Williamson seeks discovery in this motion and that deadline has long since passed, his motion is denied.

H. The moving defendants' motion to strike Williamson's surreply is granted.

After the defendants filed their respective replies to Williamson's opposition to their motions for summary judgment, he filed a surreply. *See* Docket Entry 70. The moving defendants move to strike it. *See* Docket Entry 71. The Court will grant the motion.

Local Rules 7.3 and 56.1 govern motion practice as it relates to summary judgment. Local Rule 7.6 authorizes surreplies in limited circumstances, arising from objections to evidence referenced in replies supporting motions for summary judgment. If a moving party raises such an objection in its reply memorandum, the non-moving party may file a surreply addressing *only the evidentiary objection*. *See* L.R. 7.6.

Here, the defendants did not raise evidentiary objections in their reply briefs, and yet Williamson has filed an 18-page surreply, repeating the same factual allegations as his response in opposition to the respective motions for summary judgment. This violates

the Local Rule and does not assist the Court in its analysis. Accordingly, Williamson's surreply is struck.

VI.  CONCLUSION

**IT IS HEREBY RECOMMENDED** that the Court **GRANT IN PART AND DENY IN PART** the motion for summary judgment filed under Docket Entry 52 in that the Court **DENY** the motion as to defendants Sgt. Rodgers, Officer C.G. Brown, Officer Dillon, and Cpl. Kluk in their individual capacities and **GRANT** the motion as to all remaining defendants.

**IT IS FURTHER RECOMMENDED** that the Court **GRANT** Joanna Peach's motion for summary judgment filed under Docket Entry 54.

**IT IS HEREBY ORDERED** that Peach's motion to seal, Docket Entry 57, is **DENIED**.

**IT IS HEREBY ORDERED** that Williamson's motion for issuance of a subpoena, Docket Entry 60, is **DENIED**.

**IT IS HEREBY ORDERED** that the defendants' motion to strike Williamson's surreply, Docket Entry 71, is **GRANTED**.

21

The clerk is directed to unseal all sealed materials, Docket Entries 55, 55-1, and 55-2.

JoAnna Gibson McFadden
United States Magistrate Judge

August 7, 2026

22